**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION and SEIU-UHW, | ) ) ) |
| Plaintiffs, | ) Civil No. _____ |
| v. | ) ) |
| | ) **COMPLAINT** |
| DON WRIGHT, Acting Secretary of the U.S. Department of Health and Human Services; R. ALEXANDER ACOSTA, Secretary of Labor; and STEVEN T. MNUCHIN, Secretary of the Treasury, in their official capacities, | ) (Administrative Procedure Act Case) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Plaintiffs American Civil Liberties Union ("ACLU") and SEIU-UHW, for their complaint

in the above-captioned matter, allege as follows:

**PRELIMINARY STATEMENT**

1.     On October 6, 2017, the Trump Administration issued Interim Final Regulations

("IFRs") that violate the Constitution. The Religious Exemption IFR[1] endorses and promotes

certain religious beliefs at the expense of third parties.  Both the Religious Exemption IFR and the

Moral Exemption IFR[2] discriminate against women by singling out for disfavored treatment

---

[1]     As used herein, the term Religious Exemption IFR encompasses the Interim Final Rules entitled *Religious Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act* issued by the Department of the Treasury, Department of Labor, and Department of Health and Human Services on October 6, 2017, *available at* https://www.federalregister.gov/documents/2017/10/13/2017-21851/religious-exemptions-and-accommodations-for-coverage-of-certain-preventive-services-under-the.

[2]     As used herein, the term Moral Exemption IFR encompasses the Interim Final Rules entitled *Moral Exemptions and Accommodations for Coverage of Certain Preventative Services under the Affordable Care Act* issued by the Department of the Treasury, Department of Labor, and Department of Health and Human Services on October 6, 2017, *available at* https://www.federalregister.gov/documents/2017/10/13/2017-21852/moral-exemptions-and-accommodations-for-coverage-of-certain-preventive-services-under-the-affordable.

health insurance that women use and that is essential for women's equality. Specifically, the IFRs allow any entity, including for-profit companies, as well as non-profits, universities, hospitals, and others, to invoke religious or moral beliefs to block employees and students from receiving insurance coverage that they would otherwise be entitled to receive by law. In so doing, the IFRs facilitate and give employers license to discriminate against women based on religion or other grounds.

2.      The IFRs grant broad exemptions to the Affordable Care Act ("ACA")'s requirement that health insurance plans include contraception coverage without a co-pay. The contraception coverage requirement is authorized by the Women's Health Amendment to the ACA, which Congress adopted to address discrimination in health care against women.[3] Without access to contraception, women are unable to plan the number and spacing of their children, which is crucial to their health and well-being. Moreover, access to contraception plays a critical role in women's equal participation in society and the workforce.

3.      By authorizing businesses, non-profit organizations, and universities to impose their religious beliefs on their employees and students, and rob women of health coverage that is otherwise guaranteed by law, the Religious Exemption IFR violates the Establishment Clause. Furthermore, by authorizing employers to block contraception coverage based on religious or other grounds, both IFRs violate the right to equal protection guaranteed by the Fifth Amendment to the U.S. Constitution. Moreover, because the IFRs were promulgated without good cause for foregoing notice and comment and without providing a reasoned basis for the change in agency position as required by the Administrative Procedure Act, they violate federal statutory requirements that agencies not act in an arbitrary and capricious manner and observe procedures required by law. Finally, the IFRs exceed the statutory authority given to the agencies by the Affordable Care Act.

---

[3]      This complaint uses the term "women" both because the data Plaintiffs cite throughout this complaint concern women and because women are targeted by the IFRs. Plaintiffs recognize, however, that the denial of reproductive health care (and insurance coverage for such care) also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

**JURISDICTION AND VENUE**

4.      This action arises under the First and Fifth Amendments to the United States Constitution, and the Administrative Procedure Act, and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331.

5.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Federal Rules of Civil Procedure 57 and 65, and by the inherent equitable powers of this Court.

6.      This Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

7.      Venue is proper in this district under 28 U.S.C. § 1391(e).

**INTRADISTRICT ASSIGNMENT**

8.      This action arises in the San Francisco Division because Plaintiff SEIU-UHW's headquarters are in Oakland.

**PARTIES**

9.      Plaintiff ACLU is a non-profit, non-partisan, public-interest membership organization dedicated to defending the civil liberties guaranteed by the Constitution and the nation's laws.  The ACLU has more than 1.5 million members nationwide.

10.     The ACLU has a long history of defending the fundamental right to religious liberty, and routinely brings cases to protect the right to religious exercise and expression, including for people of majority and minority faiths.  At the same time, the ACLU is deeply committed to fighting for reproductive rights and gender equality.

11.     Plaintiff SEIU-UHW is a labor organization representing more than 90,000 members who are health care workers employed in hospitals and health care clinics throughout the State of California.  SEIU-UHW is organized for the purpose of representing and improving the working lives of its members and all working people, and promoting quality, affordable health care for all.

12.     The ACLU and SEIU-UHW have members who work for employers or attend universities that are likely to invoke the exemption to the contraception benefit that is authorized

by the IFRs, including some ACLU members who receive their insurance coverage from an entity that has challenged the contraception coverage requirement. The affected ACLU and SEIU-UHW members currently have insurance coverage for contraception under the ACA, but are likely to lose that coverage as a result of the IFRs.

13.     **Defendant Don Wright** is the Acting Secretary of the Department of Health and Human Services. The Department of Health and Human Services is a federal agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1). He is sued in his official capacity.

14.     **Defendant R. Alexander Acosta** is the Secretary of Labor. The Department of Labor is a federal agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1). He is sued in his official capacity.

15.     **Defendant Steven T. Mnuchin** is the Secretary of the Treasury. The Department of Treasury is a federal agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1). He is sued in his official capacity.

### THE AFFORDABLE CARE ACT WOMEN'S PREVENTIVE BENEFITS

16.     The Affordable Care Act requires health insurance plans to cover certain preventive services without cost-sharing. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, sec. 1001, § 2713(a), 124 Stat. 119, 131–32 (2010) (codified at 42 U.S.C.A. § 300gg-13).

17.     The Women's Health Amendment ("WHA") was adopted during debate over the ACA to ensure that the list of covered services would include preventive services unique to women. *Id.* § 2713(a)(4).

18.     In passing the WHA, Senator Mikulski noted, "[o]ften those things unique to women have not been included in health care reform. Today we guarantee it and we assure it and we make it affordable by dealing with copayments and deductibles . . . ." 155 Cong. Rec. S11,979, S11,988 (daily ed. Nov. 30, 2009) (statement of Sen. Mikulski).

19.     In particular, the WHA was intended to address gender disparities in out-of-pocket health care costs, which stem in large part from reproductive health care.

20.     As Senator Gillibrand explained: "Not only do we [women] pay more for the coverage we seek for the same age and the same coverage as men do, but in general women of childbearing age spend 68 percent more in out-of-pocket health care costs than men. . . . This fundamental inequity in the current system is dangerous and discriminatory and we must act.  The prevention section of the bill before us must be amended so coverage of preventive services takes into account the unique health care needs of women throughout their lifespan."  155 Cong. Rec. S12,019, S12,027 (daily ed. Dec. 1, 2009).

21.     Congress effectively delegated the responsibility for developing a list of preventive services covered by the ACA to the Department of Health and Human Services ("HHS").  HHS, in turn, asked the Institute of Medicine ("IOM"), an independent, nonprofit organization, to recommend services that should be covered.

22.     The IOM recommended that the covered preventive services include, among other things, the full range of contraceptives approved by the Food and Drug Administration ("FDA"). Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 109-10 (July 2011).

23.     In making this recommendation, IOM noted that "[d]espite increases in private health insurance coverage of contraception since the 1990s, many women do not have insurance coverage or are in health plans in which copayments for visits and for prescriptions have increased in recent years." *Id.* at 109.

24.     It further noted that these cost barriers are aggravated by the fact that women "typically earn less than men and . . . disproportionately have low incomes." *Id*. at 19.

25.     Adopting IOM's recommendations, HHS required non-grandfathered plans covered by the ACA to provide health care coverage without cost-sharing for "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  *See* 45 C.F.R. § 147.130(b)(1); Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services: Required Health Plan Coverage Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 6, 2017).

26.     In announcing the regulations related to the contraception requirement, HHS emphasized the importance of including contraception in the designated list of preventive services, not only to equalize women's health care costs but also to further women's ability to be equal participants in society.  The inability of women to access contraception, HHS noted, "places women in the workforce at a disadvantage compared to their male co-workers. Researchers have shown that access to contraception improves the social and economic status of women. Contraceptive coverage, by reducing the number of unintended and potentially unhealthy pregnancies, furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force . . . . The [federal government] aim[s] to reduce these disparities by providing women broad access to preventive services, including contraceptive services." 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012) (footnote omitted).

27.     The federal government exempted houses of worship from the contraception requirement and developed an accommodation for nonprofit entities that hold themselves out as religiously affiliated organizations and closely held businesses.  Under this accommodation, eligible employers who object on religious grounds can opt out of providing coverage "for some or all of any contraceptive items or services required to be covered" by completing a one-page form. 26 C.F.R. § 54.9815-2713A(a); Ctrs. for Medicare and Medicaid Servs. Form No. CMS-10459: Coverage of Certain Preventive Services under the Affordable Care Act (2015).  This form can be sent to either the insurance company or the federal government. 26 C.F.R. § 54.9815-2713A(a)(3) (2015).  The insurance company then administers and pays for those contraceptive services, including by communicating directly with the employees or students about the coverage, and the employer or university has no responsibility for paying for or communicating about the coverage.  *Id.* § 54.9815-2713A(c)-(d).

## THE IMPORTANCE OF CONTRACEPTION COVERAGE FOR
## WOMEN'S HEALTH AND EQUALITY

28.     Before the ACA, many Americans were unable to access preventive health care. Due in large part to cost, Americans used preventive services at about half the recommended rate.

*See* Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 19-20, 109 (July 2011).

29.     This was particularly true of women: A 2010 survey showed that less than half of women were up to date with recommended preventive care screenings and services. *Id.* at 19.

30.     Preventive care for women includes contraception.  Ninety-nine percent of all sexually active women have used birth control at some point in their lives.  *See* Kimberly Daniels et al., *Contraceptive Methods Women Have Ever Used: United States, 1982-2010*, National Health Statistics Reports (Feb. 14, 2013).

31.     Certain contraception is used for medically prescribed purposes other than preventing pregnancy, such as hormonal disorders and endometriosis.  *See, e.g.*, Molina Dayal & Kurt T. Barnhart, *Noncontraceptive Benefits and Therapeutic Uses of the Oral Contraceptive Pill*, 19 Seminars in Reprod. Med. 295, 295 (2001).

32.     Many women are unable to afford contraception – even with insurance – because of high co-pays or deductibles, *see generally* Su-Ying Liang et al*.*, *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills Between 1996 and 2006*, 83 Contraception 528, 531 (2011); others cannot afford to use contraception consistently, *see* Guttmacher Institute, *A Real-Time Look at the Impact of the Recession on Women's Family Planning and Pregnancy Decisions* 5 (Sept. 2009), http://www.guttmacher.org/pubs/RecessionFP.pdf; and costs drive women to less expensive and less effective methods, *see* Jeffrey Peipert et al*.*, *Continuation and Satisfaction of Reversible Contraception*, 117 Obstetrics & Gynecology 1105, 1105-06 (2011).

33.     The Centers for Disease Control and Prevention has declared family planning one of the ten most significant public health achievements of the 20th century.  Ten Great Public Health Achievements—United States, 1900-1999, 48 *Morbidity & Mortality Wkly*. Rep. 241, 242 (1999), http://www.cdc.gov/mmwr/PDF/wk/mm4812.pdf.  This is because having the ability to plan one's family reduces the negative health outcomes associated with unintended pregnancies, including low birth weight, infant mortality, and maternal mortality.  Having the ability to

increase the spacing between births also reduces adverse health outcomes for both women and infants.

34.    Contraception access is also directly tied to equal opportunities for women. Indeed, access to contraception enables women to decide if and when to become a parent, allowing women to make decisions that affect their education, employment, family, and health.

35.    "Women who can successfully delay a first birth and plan the subsequent timing and spacing of their children are more likely than others to enter or stay in school and to have more opportunities for employment and for full social or political participation in their community." Susan A. Cohen, *The Broad Benefits of Investing in Sexual and Reproductive Health*, 7 Guttmacher Rep. on Pub. Policy 5, 6 (2004).

36.    The availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s. *See* Martha J. Bailey et al., *The Opt-in Revolution? Contraception and the Gender Gap in Wages*, 19, 26 (Nat'l Bureau of Econ. Research Working Paper No. 17922, 2012), http://www.nber.org/ papers/w17922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz*, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions,* 110 J. Pol. Econ. 730, 749 (2002).

37.    Removing barriers to contraception by providing access to the full range of contraception without cost has been shown to make meaningful differences in women's lives. For example, in one study, when cost was not an obstacle, more women chose long acting contraception methods such as IUDs; as a result, their rates of unintended pregnancy plummeted. *See, e.g.*, Jeffrey Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120 Obstetrics & Gynecology 1291 (2012).

### THE INTERIM FINAL RULES AUTHORIZE THE DENIAL OF CRITICAL HEALTH INSURANCE FOR WOMEN

38.    The IFRs allow employers and universities to invoke their religious or moral beliefs to block their employees' or students' health insurance coverage for contraception,

including counseling for contraception, and any health care related to changing or discontinuing a contraception method.

39.     This means that employers and universities that currently invoke the accommodation can claim an exemption under the IFRs.  By claiming an exemption, the employer or university will prevent the insurance company from providing contraception coverage.

40.     Furthermore, employers that were not previously eligible for the accommodation, can also now obtain either an accommodation or a complete exemption.

41.     Women who receive their health insurance through an entity that claims an exemption will lose their contraception coverage on the first day of the first plan year that begins thirty days after the date of the revocation of the accommodation or sixty days after notice of the revocation.

42.     The Departments of Treasury, Labor and Health and Human Services simultaneously implemented these changes through interim final rules with immediate effective dates. These rules constitute final agency action and are legislative rules within the meaning of the Administrative Procedure Act.

43.     The agencies did not observe the process set forth in the Administrative Procedure Act, which requires good cause for foregoing notice and comment and waiving the 30-day waiting period between publication and effective date, nor did they provide reasoned explanation for changing policy as required by law.

44.     The agencies exceeded their statutory authority under the ACA in violation of the Administrative Procedure Act.  Section 1557 of the ACA prohibits sex discrimination, but the IFRs sanction sex discrimination as discussed above.  Moreover, Section 1554 of the ACA prohibits the Secretary of Health and Human Services from promulgating regulations that create unreasonable barriers to the ability of individuals to obtain appropriate medical care, but as discussed above, the IFRs create unreasonable barriers to contraception care.  Thus, the IFRs exceed the statutory authority given to the agencies.

///

## FIRST CLAIM FOR RELIEF

## GOVERNMENT ESTABLISHMENT OF RELIGION

## IN VIOLATION OF THE FIRST AMENDMENT

45.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs 1 through 44.

46.     The First Amendment to the United States Constitution safeguards religious liberty by prohibiting official religious favoritism and barring government establishment of religion.

47.     On its face, the Religious Exemption IFR violates the Establishment Clause of the First Amendment.

48.     The Religious Exemption IFR has the predominant purpose of advancing a particular set of religious beliefs.

49.     The Religious Exemption IFR has the predominant effect of advancing a particular set of religious beliefs.

50.     The Religious Exemption IFR is an official governmental endorsement of particular religious organizations and beliefs.

51.     The Religious Exemption IFR fosters excessive government entanglement with religion.

52.     The Religious Exemption IFR is not neutral between religion and nonreligion, and it promotes and favors religious organizations and particular religious beliefs.  The Religious Exemption IFR allows certain religious beliefs to be imposed upon others who must bear the cost.

## SECOND CLAIM FOR RELIEF

## DENIAL OF EQUAL PROTECTION UNDER THE FIFTH AMENDMENT

53.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs 1 through 44.

54.     The Due Process Clause of the Fifth Amendment to the United States Constitution guarantees the people equal protection of the laws.

55.     On their face, the IFRs violate the equality principle embodied in the Fifth Amendment.

Complaint

56.     By allowing employers and schools to deny only preventive health benefits that women need, the IFRs classify based on gender and therefore discriminate based on sex.

57.     The IFRs intentionally and impermissibly impose burdens on women that interfere with their equal participation in the workforce and education and therefore discriminate based on sex.

58.     The IFRs perpetuate gender stereotypes and therefore discriminate based on sex.

### THIRD CLAIM FOR RELIEF

### ARBITRARY AND CAPRICIOUS

### IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

59.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs 1 through 44.

60.     The IFRs are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law and should be set aside as unlawful pursuant to the Administrative Procedure Act, 5 U.S.C. § 706 (2012).

   a.     The IFRs constitute final agency action and are legislative rules within the meaning of the Administrative Procedure Act.

   b.     The IFRs take effect immediately, without the required 30-day waiting period between publication and effective date, without good cause for doing so.

   c.     The IFRs were adopted without observing the notice and comment procedures required by the Administrative Procedure Act, which includes publishing the proposed rule, allowing appropriate time for public comment and considering those comments prior to issuing a final rule, without good cause for doing so.

   d.     The IFRs reverse, in part, a prior agency decision, without providing a reasoned explanation for this change in policy.

   e.     The IFRs were adopted without showing that the change in contraception policy is evidence-based or evidence-informed.

///

///

### FOURTH CLAIM FOR RELIEF
### EXCESS OF STATUTORY AUTHORITY
### IN VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

61.     The IFRs are in excess of statutory authority and should be set aside as unlawful pursuant to the Administrative Procedure Act 5 U.S.C. § 706.

a.     The IFRs are contrary to Section 1557 of the ACA, which prohibits sex discrimination in health insurance, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraception coverage, as discussed *supra*.

b.     The IFRs are contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that, *inter alia*, creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care. The IFRs are contrary to this statutory provision because they unreasonably create a barrier to women who need contraception.  As discussed *supra*, some women have historically been unable to obtain contraception because of cost barriers.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

1.     Declare, pursuant to 28 U.S.C. § 2201, that the Religious Exemption IFR, as set forth above, violates the First and Fifth Amendments to the United States Constitution;

2.     Declare, pursuant to 28 U.S.C. § 2201, that the Moral Exemption IFR, as set forth above, violates the Fifth Amendment to the United States Constitution

3.     Declare that the IFRs violate the Administrative Procedure Act;

4.     Enter an injunction prohibiting Defendants from enforcing the IFRs;

5.     Award costs and fees for this action, including attorneys' fees; and

6.     Award such further relief as this Court deems appropriate.

DATED: October 6, 2017

**SIMPSON THACHER & BARTLETT LLP**

By: _____

Alexis Coll-Very
*Pro Bono* Attorneys for ACLU Plaintiff

Alexis Coll-Very (SBN 212735)
Marissa Lambert (SBN 312567)
P. Casey Mathews (SBN 311838)
Simpson Thacher & Bartlett LLP
2475 Hanover Street
Palo Alto, California 94304-1114
Telephone: (650) 251-5000
Facsimile: (650) 251-5002
Email: *acoll-very@stblaw.com*
Email: *marissa.lambert@stblaw.com*
Email: *casey.mathews@stblaw.com*

Linton Mann III*
Matthew Bricker*
Julia Heald*
Lawrence Huang*
Meredith Karp*
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
Email: *lmann@stblaw.com*
Email: *matthew.bricker@stblaw.com*
Email: *julia.heald@stblaw.com*
Email: *lawrence.huang@stblaw.com*
Email: *meredith.karp@stblaw.com*

**ACLU FOUNDATION OF NORTHERN
CALIFORNIA, INC.**

By:   /s/ Elizabeth O. Gill_____
        Elizabeth O. Gill
        Attorney for All Plaintiffs

Elizabeth O. Gill (SBN 218311)
Christine P. Sun (SBN 218701)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

Facsimile: (415) 255-8437
Email:  egill@aclunc.org
Email:  csun@aclunc.org

**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
OF SOUTHERN CALIFORNIA**

MELISSA GOODMAN (SBN 289464)
1313 West 8th Street
Los Angeles, California 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5299
Email:  mgoodman@aclusocal.org

**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO**

David Loy (SBN 229235)
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 232-2121
Facsimile: (619) 232-0036

**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**

Brigitte Amiri*
Louise Melling*
Elizabeth Watson (SBN 295221)
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2650
Email:  bamiri@aclu.org
Email:  lmelling@aclu.org
Email: ewatson@aclu.org

Daniel Mach*
915 15th Street NW
Washington, DC 20005
Telephone: (202) 675-2330
Facsimile: (202) 546-0738
Email:  dmach@aclu.org


*Application for Admission Pro Hac Vice Forthcoming